


U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*Barbara J. Houser*

**United States Bankruptcy Judge**

**Signed December 20, 2010**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 06-31660-BJH-11 |
| SCOTT BRADLEY MEYROWITZ, | § | |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |
| | § | |
| BILL KIMPEL, KIMPEL'S JEWELRY & | § | Adversary No. 10-03227 |
| GIFTS, INC., and PROVIDENTIAL | § | |
| OPPORTUNITIES, INC. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| SCOTT BRADLEY MEYROWITZ, SCOTT | § | |
| MEYROWITZ, INC., MEYROWITZ | § | |
| INC., NUTRITOX, LLC, and CRAIG | § | |
| NEWBOLD, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION

Before the Court is the Motion to Dismiss Original Complaint filed by Meyrowitz, Inc. ("MI")

Memorandum Opinion          Page 1

(the "MI Motion") and the Motion to Dismiss Complaint or, in the Alternative, for Abstention filed

by Craig Newbold ("Newbold") (the "Newbold Motion") (collectively, the "Motions") in the above

adversary proceeding.   This Memorandum Opinion contains the Court's findings of fact and

conclusions of law with respect to the Motions in accordance with Federal Rule of Bankruptcy

Procedure 7052.

## I.      FACTUAL BACKGROUND

Plaintiff William R. Kimpel ("Kimpel") is an individual who resides in Columbiana, Ohio.

Plaintiffs Providential Opportunities, Inc. ("Providential") and Kimpel's Jewelry & Gifts, Inc.

("Kimpel's Jewelry") are Ohio corporations owed by Kimpel.[1]   Kimpel filed his own case under

chapter 7 of the Bankruptcy Code in the Northern District of Ohio on October 15, 2005 – i.e., Case

No. 05-49432.   Kimpel's Jewelry filed its chapter 11 case on the same date in the same court – i.e.,

Case No. 05-49330.   Kimpel received a discharge in his case on June 15, 2006.   A plan was

confirmed in the Kimpel's Jewelry case on May 23, 2007.

As relevant here, Kimpel has been involved in the jewelry business in Ohio for a number of

years through Kimpel's Jewelry and Providential.   According to Kimpel, he contacted and first met

Scott Meyrowitz ("Meyrowitz") in 2002 when Kimpel was pursuing his idea of selling and marketing

rare colored diamonds to hedge funds and/or private collectors.   Meyrowitz allegedly told Kimpel

that Meyrowitz had been entrusted with the brokering of a collection of colored diamonds.   Although

the allegations in the Complaint become fairly convoluted, in essence, the Kimpels allege that they

went into business with Newbold and Meyrowitz (and various entities that Meyrowitz is alleged to

have controlled) and that the various defendants failed to perform in accordance with their alleged

---

[1]  Kimpel, Providential, and Kimpel's Jewelry shall be referred to collectively herein as "the Kimpels."

agreements, converted cash and other items of the Kimpels, and engaged in various conspiracies and other fraudulent conduct.

Of course, in the midst of their various business relationships/transactions, Meyrowitz filed for chapter 11 relief in this Court. Meyrowitz's chapter 11 case has a bit of its own tortured history but, as relevant here, Meyrowitz failed to disclose his alleged business relationship with any of the Kimpels in his schedules or statement of financial affairs. Meyrowitz confirmed a plan of reorganization on June 27, 2008 (the "Meyrowitz Plan"). On August 10, 2010, the Kimpels filed a motion for leave to file late claims in Meyrowitz's bankruptcy case, which the Court granted on October 1, 2010 due to Meyrowitz's failure to give any of the Kimpels notice of his bankruptcy filing.[2] Although the Meyrowitz Plan was confirmed, Meyrowitz has defaulted under its terms and has, in essence, disappeared. According to Meyrowitz's counsel, Meyrowitz is not (i) responding to his counsel's inquiries, and/or (ii) following his counsel's legal advice. After a second hearing on his counsel's motion to withdraw (at which Meyrowitz failed to appear or respond), the Court granted the motion and authorized his counsel's withdrawal.

In sum, Meyrowitz has become unresponsive – to his former counsel, the Trustee created under the Meyrowitz Plan (who is responsible for collecting certain post-confirmation income from Meyrowitz and distributing it to creditors), his creditors, and this Court. In addition, while named as an individual defendant in this adversary proceeding, Meyrowitz has failed to file an answer or otherwise respond to the Kimpels' allegations in the Complaint. The Court anticipates that the

---

[2] Surprisingly, as of November 30, 2010 (when the Newbold Motion was heard), no proof of claim had been filed by the Kimpels. At that hearing, the Court inquired of the Kimpels' counsel why no proof of claim had been filed. Counsel explained that he had been too busy to file such a claim (dealing with issues in this adversary proceeding), but that such a claim would be filed within 24 hours. However, again surprisingly, to date no such claim has been filed.

**Memorandum Opinion** **Page 3**

Kimpels will seek the entry of a default judgment against Meyrowitz if the adversary proceeding remains pending here.

## II.    CONTENTIONS OF THE PARTIES

MI, a Georgia corporation with its principal place of business in Atlanta, Georgia, is allegedly owned by Meyrowitz's brother Barry.  According to MI, "[f]or the last several years, MI has had no business associations with the Debtor [Meyrowitz], Scott Meyrowitz, Inc., or Nutritox, LLC."  MI Motion at ¶ 3.  In the MI Motion, MI contends that (i) this Court lacks jurisdiction over the claims asserted against MI, and (ii) the Kimpels have failed to state any claims against it due to the "broad, vague, conclusory allegations in violation of Federal Rules of Civil Procedure 8 and 9."  *Id*. at ¶ 2.

Newbold, an Ohio resident, denies that the causes of action asserted against him in the Complaint constitute core proceedings and refuses to consent to the entry of a final judgment by this Court.  Newbold Motion at ¶ 1.  Moreover, in the Newbold Motion, he contends that (i) this Court lacks jurisdiction over the claims asserted against him; (ii) these claims were not "specifically and unequivocally preserved" in the plan confirmed in the Kimpel's Jewelry bankruptcy case (the "KJ Plan") such that the claims are barred by the doctrine of *res judicata*;[3] and (iii) in the alternative, this Court should abstain from hearing this adversary proceeding in the interests of justice and comity, citing 28 U.S.C. § 1334(c)(1).[4]

In response, the Kimpels contend that (i) this Court has "related to" jurisdiction over the

---

[3]  On this point Newbold cites *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351 (5th Cir. 2008).

[4]  In a pleading filed following the hearing on the Newbold Motion, Newbold also argues that the claims asserted by Kimpel's Jewelry and Kimpel are barred by judicial estoppel.  This issue will be discussed further later in this Memorandum Opinion.  *See infra* at pp. 20-32.

**Memorandum Opinion**                                                                                          **Page 4**

claims asserted in the Complaint; (ii) all claims asserted by Kimpel's Jewelry were sufficiently preserved in the KJ Plan; (iii) the claims are sufficiently pled in the Complaint against both MI and Newbold, but if the Court disagrees, leave to amend should be given to them; and (iv) abstention is not appropriate.

Moreover, apparently anticipating the Court's rulings on the MI Motion regarding the sufficiency of the Complaint, on November 29, 2010 (the eve of the hearing on the Newbold Motion (the "Newbold Hearing")), the Kimpels filed, without leave to amend having been granted to them, their First Amended Complaint. The Kimpels argued at the Newbold Hearing that leave to amend was not required. Both MI and Newbold disagreed, arguing that the Kimpels had no right to amend without first having obtained their consent or the Court's leave in accordance with Federal Rule of Civil Procedure 15(a)(2).

## III.    LEGAL ANALYSIS

### A.    Which Complaint is the Live Complaint?

The parties have a threshold disagreement over which complaint the Court should evaluate when considering the Motions.[5] For the reasons explained more fully below, the Court concludes that the Kimpels did not have a right to amend the Complaint because they never obtained leave to amend

---

[5] At the Newbold Hearing, the Court asked counsel for the Kimpels to file a supplemental brief addressing certain issues that had not been adequately addressed by the Kimpels in their earlier submissions. Specifically, the Court directed further briefing by the Kimpels on abstention, *res judicata* and standing. The Court also told counsel for MI and Newbold that they could file further briefing if they felt it necessary. The deadline for such further briefing was 5:00 p.m. on December 7, 2010. On that date, MI filed its Motion to Dismiss First Amended Complaint "to further clarify to the Court the relief requested by MI in its First Motion to Dismiss and at the November 30, 2010 hearing." Mot. to Dismiss First Amended Compl. at ¶ 8. In sum, MI "requests that the Court either (1)(a) enter an order dismissing the Amended Complaint as to Meyrowitz, Inc., or (b) abstain from exercising jurisdiction with respect to this adversary proceeding; or (2) set a briefing schedule to allow Meyrowitz, Inc. to submit briefing in support of this Motion; and (3) grant Meyrowitz, Inc. such further relief as to which it may be entitled." *Id.* at ¶ 19. Because the Court ultimately decides to abstain from exercising jurisdiction with respect to the claims against the non-debtor defendants, *see infra* at pp. 11-15, the Court need not consider this motion further or request further briefing from the parties with respect to it.

nor did they receive the consent of MI or Newbold. *See* Fed. R. Civ. P. 15(a)(2). Accordingly, the First Amended Complaint will be stricken, and the Court will proceed to evaluate the Motions against the claims as pled in the Complaint. *See Hunter v. Martinez,* No. 3-08-CV-893-B, 2008 WL 3895969, at *2 n.2 (N.D. Tex. Aug. 20, 2008) (amended complaint stricken *sua sponte* under Rule 15(a)(2) where plaintiff filed the complaint without leave or consent "in a transparent attempt to remedy the fatal flaws" of the prior pleading).

While neither party briefed this issue, the Kimpels appear to be relying upon the now-defunct Rule 15(a)- *i.e.,* the Rule that was in effect prior to December 1, 2009 – for their position. That Rule did indeed state that "[a] party may amend its pleading once as a matter of course before being served with a responsive pleading." However, that Rule was replaced with new language, which became effective on December 1, 2009. The language that is applicable to this adversary proceeding provides that "[a] party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed R. Civ. P. 15(a)(1).

Application of Rule 15(a)(1)(A) works against the Kimpels here because the Complaint was filed on August 10, 2010. Thus, the Complaint could be freely amended within 21 days of August 10, 2010 – *i.e.,* by August 31, 2010. Yet the First Amended Complaint was not filed until November 29, 2010 – *i.e.,* almost three months after the deadline.

Likewise, application of Rule 15(a)(1)(B) works against the Kimpels because MI filed the MI Motion on October 11, 2010 and Newbold filed the Newbold Motion on October 12, 2010. There is no question that the Motions are brought pursuant to Rule 12(b); therefore there is no question that

the Kimpels had 21 days from those dates within which to amend their claims against them – *i.e.,* by October 31, 2010 (as to MI) and November 1, 2010 (as to Newbold). Yet, as noted above, the First Amended Complaint was not filed until November 29, 2010 – *i.e.,* at least 28 days after the deadline.

For these reasons, the Kimpels were not at liberty to freely amend when they filed the First Amended Complaint on November 29, 2010 and that complaint is stricken from the record.

### B. Does this Court have Subject Matter Jurisdiction or Must the Complaint be Dismissed under Fed. R. Bankr. P. 7012 and Fed. R. Civ. P. 12(b)(1)?

The parties also have a threshold disagreement with respect to this Court's subject matter jurisdiction. While all parties agree that this Court's jurisdiction is, at best, premised upon "related to" jurisdiction under 28 U.S.C. § 1334, MI and Newbold contend that the traditional test for "related to" jurisdiction – *i.e.,* a proceeding is "related to" a bankruptcy case if it could conceivably have an effect on the bankruptcy estate being administered – is not the relevant test. Rather, according to MI, this Court's "related to" jurisdiction is more limited now that the Meyrowitz Plan has been confirmed – *i.e.,* "[a]dditionally, 'upon plan confirmation, a debtor is no longer a debtor in possession and the bankruptcy estate ceases to exist.'" MI Motion at ¶ 5 (citing, *inter alia*, *Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters. Ltd., II (In re Briscoe Enters. Ltd., II)*, 138 B.R. 795, 809 (N.D. Tex. 1992) *rev'd on other grounds*, 994 F.2d 1160 (5th Cir. 1993)). Newbold contends that "[a]fter confirmation of a plan, the bankruptcy court's subject matter jurisdiction is narrowed to 'matters pertaining to the implementation or execution of the plan.'" Newbold Motion at ¶ 9 (citing *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390-91 (5th Cir. 2001)).

While the Kimpels do not dispute the fact that the bankruptcy court's "related to" jurisdiction is more limited upon confirmation of a chapter 11 plan in many circumstances, they contend that this

is not true upon confirmation of a chapter 11 plan for an individual debtor like Meyrowitz after the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Specifically, relying upon § 1115 and the doctrine of *expressio unius est exclusio alterius*, the Kimpels argue that a bankruptcy estate continues to exist after confirmation of a plan in an individual chapter 11 case, thus rendering the *Craig's Stores* line of cases inapplicable. Also, relying on a virtually identical provision applicable in chapter 13 cases – *i.e.*, § 1306, and the analysis of post-confirmation jurisdiction in the chapter 13 context in *Rodriguez v. Countrywide Home Loans, Inc.*, 421 B.R. 356 (Bankr. S.D. Tex. 2009), the Kimpels argue that this Court has "related to" jurisdiction over the claims asserted in the Complaint. For the reasons explained more fully below, the Court concludes that it has "related to" jurisdiction over the claims asserted in the Complaint, although not for the reasons advanced by the Kimpels.

The starting point of the Court's analysis is its conclusion that a bankruptcy estate continues to exist after confirmation of a chapter 11 plan for an individual debtor. Section 1115(a) of the Bankruptcy Code provides, in part, that property of the estate includes "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12 or 13 of this title . . .." 11 U.S.C. § 1115(a)(2). Thus, under the literal terms of § 1115(a)(2), income received by Meyrowitz post-confirmation remains property of the estate until his bankruptcy case is closed, dismissed or converted, none of which have yet occurred.

Section 1141(b) of the Bankruptcy Code provides that unless stated otherwise in the plan, confirmation of the plan vests all of the property of the estate in the debtor. While no court has addressed the interplay of these provisions, several courts have addressed the interplay of virtually

identical provisions in the chapter 13 context. Specifically, these courts have addressed the "supposed conflict" of "whether income received by a chapter 13 debtor post-confirmation is property of the debtor or the estate under §§ 1327(b) and 1306(a)(2)." *Rodriguez*, 421 B.R. at 373. After noting that the courts "have generally dealt with this supposed conflict using one of four approaches," *id.*, the *Rodriguez* court adopted the so-called "reconciliation approach" previously adopted by the First, Eighth, and Eleventh Circuits and explained its analysis as follows:

> Section 1306(a)(2) provides that 'earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted' are property of the estate. Section 1327(b) provides that, unless otherwise stated, 'the confirmation of the plan vests all of the property of the estate in the debtor.' The two statutes can be reconciled by treating all post-confirmation, *future income* as property of the estate. Thus, at confirmation, all of the property that is *currently* property of the estates [sic] could vest in the debtor; and all of the debtor's future income would still be estate property.

*Rodriguez*, 421 B.R. at 374 (citation omitted and emphasis in original).

This Court finds the reconciliation approach persuasive and concludes that it should be applied to §§ 1115 and 1141 in the individual chapter 11 debtor context. Accordingly, this Court concludes that all post-confirmation income received by Meyrowitz is property of his bankruptcy estate and that such estate will continue to exist until his bankruptcy case is "closed, dismissed, or converted to a case under chapter 7, 12, or 13 . . .." 11 U.S.C. § 1115(a)(2).

With this threshold issue of whether a bankruptcy estate continues to exist post-confirmation resolved, the Court must analyze its "related to" jurisdiction over the claims asserted against MI and Newbold in the Complaint. If those claims relate to property of the estate that existed at confirmation, then the Court agrees with Newbold that the Fifth Circuit's test for post-confirmation jurisdiction articulated in the *Craig's Store* case applies and the Kimpels must demonstrate that their claims pertain to the implementation or execution of the plan. Alternatively, if the Kimpels' claims

relate to Meyrowitz's post-confirmation income and thus the Meyrowitz post-confirmation bankruptcy estate, then the Kimpels must demonstrate that their claims could "conceivably have any effect on the estate being administered in bankruptcy." *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1022 (5th Cir. 1999). As the *Bass* court further stated, "[m]ore specifically, an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and . . . in any way impacts upon the handling and administration of the bankruptcy estate." *Id.* (citation omitted).

As noted previously, the Kimpels requested and received Court authority to file late proofs of claim in the Meyrowitz bankruptcy case because Meyrowitz failed to give them notice of his bankruptcy filing. And according to the Kimpels' counsel they will be filing such claims. Moreover, the Kimpels filed this adversary proceeding seeking to liquidate their claims against Meyrowitz and the other non-debtor defendants through the continued prosecution of the Complaint. So, as it relates to Meyrowitz, the Complaint essentially seeks the allowance of a liquidated, unsecured claim against Meyrowitz by some or all of the Kimpels.[6]

Under the Meyrowitz Plan, holders of allowed unsecured claims "shall receive from the Plan Trust their pro rata share of the Salary Contribution, the Ancillary Income and the License Fee Income which are required to be sent to the Plan Trust . . .." Revised Second Amended New Plan of Reorganization of Scott B. Meyrowitz at § 3.05. In turn, the Meyrowitz Plan defines Salary Contribution, Ancillary Income, and License Fee Income in a way that makes clear that such amounts are post-confirmation income under § 1115(a)(2), and thus are property of the bankruptcy estate.

---

[6] Based upon the allegations in the Complaint, it is virtually impossible to tell which Kimpel entity owns or asserts which claims against which of the defendants.

**Memorandum Opinion**                                                                                          **Page 10**

*Id.* at §§ 1.47, 1.07, & 1.29, respectively.[7] Accordingly, the Court concludes that the prepetition unsecured claims asserted against Meyrowitz in the Complaint relate to the post-confirmation bankruptcy estate since, if allowed, the claims would be paid out of Meyrowitz's post-confirmation income.

In turn, the Kimpels assert essentially the same claims against MI and Newbold (and the other non-debtor defendants). To the extent the Kimpels prevail on any of these claims, obtain judgments against MI and/or Newbold (and/or any other non-debtor defendant), and then ultimately collect on those judgments, the Kimpels' allowable claims against the Meyrowitz bankruptcy estate would be reduced by any such recovery and the Kimpels' entitlements under the Meyrowitz Plan would be reduced accordingly. Thus, it is "conceivable" that the outcome of the Kimpels' claims against MI and/or Newbold (and/or the other non-debtor defendants) could "alter the debtor's . . . liabilities . . . and . . . impact[] . . . the handling and administration of the bankruptcy estate." *Bass*, 171 F.3d at 1022. Accordingly, the Court concludes that it has "related to" jurisdiction over the claims asserted against MI, Newbold, and the other non-debtor defendants in the Complaint.

### C. Should this Court Abstain from Hearing the Claims asserted in the Complaint?

Newbold seeks to have this Court abstain from hearing this adversary proceeding under 28 U.S.C. § 1334(c)(1) – *i.e.*, permissive abstention. While the Kimpels oppose abstention, they agree that the factors cited by Newbold are the relevant factors to consider when deciding whether permissive abstention is appropriate. Pls.' Response to Def. Craig Newhold's Mot. to Dismiss Compl. or, in the Alternative for Abstention at ¶ 16 ("Looking at the factors cited by Newbold, we

---

[7] Licencing Fee Income is not defined in the Plan. However, License Fees are defined in § 1.29.

see that, taken as a whole, they tend to support a decision by this Court to keep this matter before it."); Pls.' Post-Hr'g Br. at ¶¶ 10-24.

Accordingly, the Court will analyze the factors relied upon by Newbold and articulated in *In re Denton County Elec. Co-Op.*, 281 B.R. 876, 881 (Bankr. N.D. Tex. 2002). First, abstention has no effect on the efficient administration of the Meyrowitz bankruptcy estate. The Kimpels do not need to prosecute this adversary proceeding in order to have an unsecured claim allowed in the Meyrowitz bankruptcy case. As noted previously, they can simply file a proof of claim in the case, as they apparently intend to do. Once filed, that claim will be entitled to prima facie validity unless objected to by Meyrowitz or some other party-in-interest in the Meyrowitz bankruptcy case. Fed. R. Bankr. P. 3001(f); *see Matter of O'Connor*, 153 F.3d 258, 260 (5th Cir. 1998). While it appears that the Kimpels would also like to establish their entitlement to an allowed administrative claim in the Meyrowitz bankruptcy case, they cannot do that through the continued prosecution of this adversary proceeding. Rather, they are required to file a motion in the main bankruptcy case seeking the allowance of any such claim. 11 U.S.C. § 503. All parties in interest in the Meyrowitz bankruptcy case are entitled to receive notice of such a request and have a right to be heard before any administrative claim can be granted to the Kimpels. *Id*. So, in short, the Kimpels simply do not need this adversary proceeding in order to have claims allowed in the Meyrowitz bankruptcy case. And while the Kimpels would have to credit any amounts recovered from the non-debtor defendants (assuming that the Kimpels are successful in their claims against the non-debtors defendants in another forum), the legal obligation to credit their claim(s) here has no real effect on the efficient administration of the Meyrowitz bankruptcy estate. Thus, this factor weighs in favor of abstention.

Second, the claims raised in the Complaint are all state law claims, causing this factor to weigh

in favor of abstention.  Third, the issues raised in the Complaint do not appear terribly difficult or unsettled, causing this factor to be neutral.  Fourth, there is no related proceeding already pending in some other court, causing this factor to weigh against abstention.  Fifth, there is no jurisdictional basis other than 28 U.S.C. § 1334 for the claims asserted in the Complaint, causing this factor to weigh in favor of abstention.  Sixth, the claims asserted in the adversary proceeding have little to do with the main Meyrowitz bankruptcy case, causing this factor to weigh in favor of abstention.  Seventh, other than the claims against Meyrowitz, the claims asserted in the Complaint are not "core" proceedings, causing this factor to weigh in favor of abstention.  Eighth, it is feasible to allow the claims against the non-debtor defendants to proceed in a non-bankruptcy court forum.  As noted previously, the Kimpels' claims against Meyrowitz can be determined in a more simplified process – *i.e.*, through the filing of a proof of claim (regarding their alleged unsecured prepetition claims) or by motion practice (regarding their alleged post-petition administrative claim).  While the Kimpels argue that Meyrowitz (i) is a necessary party to their claims against the non-debtor defendants due to their conspiracy allegations, and (ii) is protected from suit by the automatic stay, it is unclear that Meyrowitz is a necessary party.  Moreover, the automatic stay can be modified to permit him to participate in another forum if that proves to be necessary.  Thus, this factor weighs in favor of abstention.

Ninth, this Court's docket is heavy.  It is a burden on this Court's docket to litigate state law claims against non-debtor defendants when the outcome of that litigation will have such little effect on the bankruptcy estate, causing this factor to weigh in favor of abstention.  Tenth, the Court is satisfied that no forum shopping is involved here.  Thus, this factor is neutral.

Eleventh, several defendants may have jury trial rights.  In any event, Newbold has not

consented to this Court's entry of a final judgment. Thus, the reference of this adversary proceeding to this Court may have to be withdrawn with trial in the District Court (if jury trial rights are asserted) or at least *de novo* review of this Court's proposed findings and conclusions by the District Court–an inefficient process at best. While the Kimpels oppose abstention and argue that it will be inefficient for another court to learn about the Meyrowitz bankruptcy case, the truth is that what happened in that bankruptcy case is largely irrelevant to the Kimpels' claims. And while the Court has reviewed the Complaint, it knows nothing about the Kimpels' claims other than what it has read in that document, which any judge hearing these claims would learn in short order. Thus, this factor weighs in favor of abstention.

Finally, and as noted previously, given the fact that the Kimpels can have allowable claims against the Meyrowitz bankruptcy estate through simpler procedures – *i.e.*, the filing of a proof of claim and/or motion practice, the real point of the continued prosecution of this adversary proceeding is to obtain judgments against the non-debtor defendants. Accordingly, this factor weighs in favor of abstention.

As the above analysis demonstrates, this Court should abstain from hearing the claims asserted in the Complaint against the non-debtor defendants. Its resources are better spent hearing live disputes in (i) its active bankruptcy cases, and (ii) "related to" proceedings that have a more substantial impact upon an active bankruptcy estate. If the Kimpels believe that they have legitimate claims against the non-debtor defendants, they can sue them in whatever other forum they believe is appropriate and credit their claim here with any recoveries received in that other forum.

Because this Court has decided to abstain, it is not necessary to address the remaining issues raised in the Motions. However, the Court will provide its analysis of these issues as alternative

rulings to its decision to abstain in the event an appeal is filed and the Court's decision to abstain is reversed. We turn to these rulings now.[8]

### D. Have the Kimpels Stated Claims against MI upon which Relief can be Granted in accordance with Fed. R. Bankr. P. 7012 and Fed. R. Civ. P. 12(b)(6)?

#### 1. Standard for Rule 12(b)(6) Motions

Fed. R. Civ. P. 12(b)(6) permits a party to request that a complaint be dismissed for its failure to state a claim upon which relief can be granted. A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a complaint need not contain detailed factual allegations, it must contain "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007); *Jebaco Inc. v. Harrah's Operating Co. Inc.*, 587 F.3d 314, 318 (5th Cir. 2009); *McCall v. Southwest Airlines, Co.*, 661 F. Supp. 2d 647, 653 (N.D. Tex. 2009) (Lynn, J.). A plaintiff must allege enough facts to state a claim for relief that is "plausible" on its face. *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. This plausibility standard is not a probability requirement, but does require more than mere possibility. If a complaint "pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). Moreover, "a court is not to strain to find inferences favorable to the plaintiff and is not to accept [as true] conclusory allegations,

---

[8] Of course, once its abstention ruling becomes final, its alternative rulings are simply dicta.

unwarranted deductions, or legal conclusions." *St. Paul Commodities, LLC v. DB Fleet, LLC,* No. 3:09-CV-582-L, 2009 WL 3378598, at *2 (N.D. Tex. Oct. 21, 2009) (citing *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005)). The Supreme Court held in *Iqbal* that the "plausibility" standard articulated in *Twombly* applies in all civil cases. *Morgan v. Hubert*, No. 08-30388, 2009 WL 1884605, at *3 (5th Cir. July 1, 2009) (discussing *Iqbal*).

The Supreme Court has set out a two-pronged approach for reviewing a motion to dismiss for failure to state a claim. *Iqbal,* 129 S. Ct. at 1949-50; *McCall*, 661 F. Supp. 2d at 653. First, the reviewing court may identify those statements in a complaint that are actually conclusions, even if presented as factual allegations. *Iqbal*, 129 S. Ct. at 1949-50; *McCall*, 661 F. Supp. 2d at 653. Such conclusory statements, unlike proper factual allegations, are not entitled to a presumption of truth. *Iqbal*, 129 S. Ct. at 1949-50; *McCall*, 661 F. Supp. 2d at 653. It is the conclusory nature of the statements rather than any fanciful or nonsensical nature "that disentitles them to the presumption of truth." *Iqbal*, 129 S. Ct. at 1951; McCall, 661 F. Supp. 2d at 653. Second, the reviewing court presumes the truth of any remaining "well-pled factual allegations," and determines whether these factual allegations and their reasonable inferences plausibly support a claim for relief. *Iqbal*, 129 S. Ct. at 1950; *McCall*, 661 F. Supp. 2d at 653.

With this standard firmly in mind, the Court will proceed to analyze the claims pled against MI in the Complaint.

### 2. Do the Claims Pled against MI Satisfy the *Twombly* test?

The Complaint is problematic for a variety of reasons. The Complaint is, as MI contends, full of overly broad, vague, and conclusory allegations. Rather than plead any specific claims against MI, the Kimpels simply (i) lump MI with Scott Meyrowitz, Inc. and Nutritox, LLC, (ii) call those three

separate defendants "The Meyrowitz Entities," and (iii) plead all claims against "The Meyrowitz Entities" without differentiating between any of the three entities. For example, in its first count, the Kimpels assert that "The Meyrowitz Entities" entered into "one or more written contracts with Providential Opportunities and Kimpel's Jewelry." Compl. at ¶ 217. Then, when asserting a breach of contract claim arising from the so-called "First Newbold Contract," the Kimpels allege that "The Meyrowitz Entities entered into a written contract with Providential Opportunities . . . ." *Id.* at ¶ 218. Exhibit 17 to the Complaint is an unsigned copy of the so-called "First Newbold Contract." However, the only proposed signatories to that document are Newbold, Scott Meyrowitz, Inc. and Kimpel. Moreover, the document itself recites that the agreement is between those three parties (and no others). Providential is not mentioned in the document and neither is MI. MI correctly argues that it cannot be sued for breach of a contract that it never made. Similarly, in Count 2, the Kimpels sue "The Meyrowitz Entities" for breach of "one or more oral contracts with Providential Opportunities and Kimpel's Jewelry," in the alternative to their breach of written contract claim in Count 1. Compl. at ¶ 224. This claim suffers from the same defect as Count 1. You cannot breach a contract you were not a party to. Moreover, if the Kimpels wish to assert that MI entered into an oral contract with some or all of the Kimpels, those allegations should be specific as to MI, not clumped with other entities as done in the Complaint.

Similarly, in Count 3, "The Meyrowitz Entities" are sued for conversion of "rare stones owned either exclusively or partially" by the Kimpels. Compl. at ¶ 254. However, it is not possible to determine what stones were allegedly kept by MI and how such acts, if they occurred or when they occurred, constitute conversion.

Next, in Count 4, "The Meyrowitz Entities" are sued for conversion of cash because they

allegedly "maintained possession of the money *it* had received from The Kimpel Entities made in the form of loans or in the form of profits from stones to which The Kimpel Entities had co-purchased by providing cash to The Meyrowitz Entites for which *he* had subsequently sold, without paying the Kimpel Entities their rightful interest." Compl. at ¶ 257 (emphasis added). A careful review of the above quote shows that singular pronouns are used – *i.e.*, "it" and "he," after referencing "The Meyrowitz Entities." Moreover, what loans were ever made to MI, when those loans were allegedly made, and/or what stones were ever co-purchased by MI is not pled. By lumping MI in with other entities, it is impossible to understand what MI is alleged to have done (or not done). This is legally impermissible.

In Count 5 and 6, "The Meyrowitz Entities" are alleged to have conspired with Newbold and Meyrowitz to commit conversion of property and cash. The "property" is apparently the same "rare stones" referenced in Count 3. The "cash" is apparently the same "cash" referenced in Count 4. However, what MI did in furtherance of this alleged conspiracy or when MI allegedly acted is not pled.

Then, in Counts 7 and 8, "The Meyrowitz Entities" are sued for Fraud and Fraud in Concealment. The fraud and fraudulent concealment are allegedly related to "The Meyrowitz Entities'" failure to disclose Meyrowitz's bankruptcy to the Kimpels. However, nowhere addressed in the Complaint is how MI (or any of the other Meyrowitz Entities) had a duty to disclose Meyrowitz's bankruptcy filing. Absent a duty to disclose, no fraud claim can be sustained.

Finally, in Counts 9 and 10, "The Meyrowitz Entities" are alleged to have conspired with Newbold and Meyrowitz to commit fraud or fraud in concealment, again related to the alleged failure to disclose Meyrowitz's bankruptcy to the Kimpels. In addition to the "duty" problem just

mentioned, what MI did in furtherance of this alleged conspiracy or when MI allegedly acted is not pled.

The Court therefore concludes that the Kimpels have failed to state a proper claim against MI in the Complaint. Moreover, the Complaint fails to contain enough facts against MI that make any of the claims facially "plausible." *Twombly*, 550 U.S. at 570.

### 3. Should Leave to Amend be Granted?

The Court recognizes that under Fed. R. Civ. P. 15(a)(2), made applicable here by Federal Rule of Bankruptcy Procedure 7015, "[a] court should freely give leave to amend pleadings when justice so requires." *Muttathottil v. Gordon H. Mansfield*, 381 Fed.Appx. 454, 457 (5th Cir. 2010). And while there are reasons recognized in the case law for denying leave to amend, s*ee id.* (noting that possible grounds for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."), none of those grounds exist here. The MI Motion was filed very early in the life of this adversary proceeding and it is directed at the original complaint filed by the Kimpels.

So, from the Court's perspective, leave to amend would be appropriate here (if the Court had not already decided to abstain) in order to give the Kimpels the opportunity to attempt to plead proper claims against MI. So, if the Court's decision to abstain is erroneous, the Kimpels will have fourteen (14) days from the date of the entry of a final order reversing this Court's abstention decision within which to file an amended complaint.

### E. Have the Kimpels pled proper claims against Newbold?

In the Newbold Motion, Newbold contends that the Kimpels' claims are barred by *res*

*judicata* because those claims were not properly preserved in the KJ Plan; and thus, according to Newbold, the Complaint should be dismissed in accordance with Rule 12(b)(6). In his post-Newbold Hearing pleading, Newbold also contends that the Kimpels are judicially estopped to bring the pled claims. The Court will analyze these issues below.

> **1.    Are any of the Kimpels' Claims Barred by *Res Judicata*, Judicial Estoppel, or Otherwise?**

> **a.    Claims asserted by Kimpel's Jewelry.**

Relying on Fifth Circuit precedent, Newbold alleges that the claims asserted against him in the Complaint are barred by *res judicata* because those claims were not "specifically and unequivocally" preserved in the KJ Plan. Newbold Motion at ¶ 12. For the reasons explained more fully below, the Court agrees there may be a *res judicata* problem regarding the claims asserted by Kimpel's Jewelry in the Complaint.

Newbold relies on Fifth Circuit precedent in the Newbold Motion.[9] Because the Kimpel's Jewelry bankruptcy case was pending (and the KJ Plan was confirmed) in the Sixth Circuit, the Court concludes that the KJ Plan should be construed in accordance with Sixth Circuit precedent. The Sixth Circuit has held that a confirmed plan "has the effect of a final judgment" so that *res judicata* bars "relitigation of any issues raised or that could have been raised in the confirmation proceedings." *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 578 (6th Cir. 2008) (internal quotation marks and citation omitted). Section 1123 of the Bankruptcy Code provides an exception to this general rule; it permits causes of action owned by the debtor or the estate that were not resolved during the

---

[9] In his post-Newbold Hearing pleading, Newbold cites Sixth Circuit precedent to support his *res judicata* argument. *See* Craig Newbold's Supplemental Mot. to Dismiss Compl. or, in the Alternative for Abstention at ¶¶ 12-17.

bankruptcy case to be retained in the plan of reorganization and enforced thereafter by the debtor, the trustee or a representative of the estate appointed for that purpose. 11 U.S.C. § 1123(b)(3)(B). To be effective the retention language in a plan must be sufficiently specific.[10]

In the Sixth Circuit, the plan or its attendant disclosure statement must include "an express reservation … of the right to bring *specific* actions against *identified* defendants." *Kaye v. Carlisle Tire & Wheel Co.*, No. 3:07-00336, 2008 WL 821521, at *2 (M.D. Tenn. March 27, 2008) (discussing the Sixth Circuit's specificity requirement set forth in *Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002)) (emphasis in original); *Slone v. M2M Int'l, Inc. (In re G-P Plastics, Inc.)*, 320 B.R. 861, 868 (E.D. Mich. 2005) (finding significance in the fact that the plan failed to list the specific causes of action preserved); *In re Crowley, Milner & Co.*, 299 B.R. 830, 846 (Bankr. E.D. Mich. 2003) (noting the significance of the confirmed plan's failure to list specific causes of action). A general or "blanket" reservation does not avoid *res judicata* because it does not allow creditors, who must ultimately vote on a plan, "to identify and evaluate the assets potentially available for distribution." *IBM Se. Employees Fed. Credit Union v. Collins*, No. 3-07-0894, 2008 WL 4279554, at *11 (M.D. Tenn. Sept. 17, 2008) (quoting *In re Pen Holdings, Inc.*, 316 B.R. 495, 504 (Bankr. M.D. Tenn. 2004). In the *Browning* case, the Sixth Circuit determined that the following language was insufficient to preserve a cause of action:

> In accordance with section 1123(b) of the Bankruptcy Code, the Company shall retain and may enforce any claims, rights and causes of action that the Debtor or its bankruptcy estate may hold against any person or entity, including, without limitation, claims and causes of action arising under section 542, 543, 544, 547, 548, 550 or 553 of the Bankruptcy Code.

---

[10] Circuit Courts disagree about how specific the reservation language must be. *See generally* 7 Collier on Bankruptcy ¶ 1123.02[3][b], at 1123-19 (Alan N. Resnick & Henry J. Sommer eds., 16th rev. ed. 2010).

*Browning* 283 F.3d at 774-75.

The reservation language at issue here is in the KJ Plan alone; the disclosure statement attendant to the KJ Plan does not contain a reservation provision. As relevant here, the KJ Plan provides:

> 10.02 Reservation of Rights. Unless otherwise specifically provided in the Plan, neither the filing nor the confirmation of the Plan shall be interpreted or deemed to waive the Debtor's rights under the Bankruptcy Code or under other applicable law to assert causes of action or to otherwise seek relief (including, without limitation, relief under the Bankruptcy Code relating to fraudulent transfers and avoidable preferences) against any party or individual. The Debtor reserves the right to begin or continue any adversary proceeding permitted under the Bankruptcy Code and the applicable Bankruptcy Rules.

Under *Browning* and other relevant Sixth Circuit precedent, this provision is undoubtedly a general reservation clause. It does not refer to "*specific* actions against *identified* defendants." *Kaye*, 2008 WL 821521 at *2. A creditor reading this provision would have no idea that Kimpel's Jewelry intended to reserve for itself the causes of action it now asserts against any of the defendants, including Newbold and MI. In fact, Kimpel's Jewelry creditors would have had no way of knowing that such claims even existed, as they were not disclosed in the Kimpel's Jewelry schedules (Schedule B).[11] Nor would they have known that there were contracts in existence among some or all of the parties (Schedule G). The KJ Plan and its attendant disclosure statement likewise do not mention the causes of action or the contracts. Moreover, Newbold's and/or MI's very existence would likely have been a surprise to Kimpel's Jewelry creditors, as they were not scheduled as (i) creditors on Schedule F, or (ii) as just noted, parties to any executory contract with Kimpel's Jewelry on Schedule G; nor do their names appear in the KJ Plan or disclosure statement. The only reference to any of the

---

[11] Schedule B states that Kimpel Jewelry claimed no interest in *any* potential causes of action, whether against Newbold, MI, or any other defendant.

defendants appears in the Kimpel's Jewelry Statement of Financial Affairs, which reflects that Kimpel's Jewelry "held or controlled" a ring owned by Newbold. These additional facts, though not directly relevant to the reservation language's sufficiency, bolster the Court's ultimate conclusion that the reservation language in the KJ Plan did not permit any Kimpel's Jewelry claim against the defendants, including Newbold and MI, "to be taken into account in the disposition of the debtor's estate." *Browning*, 283 F.3d at 775.

Accordingly, all of the Kimpel's Jewelry claims against the defendants that were property of the Kimpel's Jewelry bankruptcy estate are barred by *res judicata* due to Kimpel's Jewelry's failure to specifically reserve those claims in the KJ Plan for later prosecution. The barred claims would include claims against Newbold and/or MI that arose (i) prior to the filing of the Kimpel's Jewelry bankruptcy case on October 15, 2005,[12] and (ii) after the petition date up through May 23, 2007, the date the KJ Plan was confirmed.[13] Conversely, since the bankruptcy estate ceases to exist upon confirmation of a plan of reorganization,[14] claims against the defendants, including Newbold and MI, that accrued after confirmation of the KJ Plan would not be barred by *res judicata* because those claims never became property of the Kimpel's Jewelry bankruptcy estate.

When disposing of a Rule 12(b)(6) motion like the Newbold Motion, the Court is to primarily consider the allegations on the face of the complaint, *Iqbal*, 129 S.Ct. at 1949, but "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint also may be taken into account." *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997) (quoting 5B

---

[12] 11 U.S.C. § 541(a)(1) (the bankruptcy "estate is comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case").

[13] 11 U.S.C. § 541(a)(7) (the bankruptcy "estate is comprised of . . . [a]ny interest in property that the estate acquires after the commencement of the case").

[14] 11 U.S.C. § 1141(b) ("... confirmation of a plan vests all of the property of the estate in the debtor").

Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2010). If a Rule 12(b)(6) motion presents materials outside the pleadings or beyond the scope of judicial notice "the court may refuse to accept such materials or convert the motion into one for summary judgment." *Bohanan v. Bridgestone/Firestone N. Am. Tire, LLC*, No. 3:06-cv-122, 2007 WL 1091209, at *2 (M.D. Tenn. April 10, 2007), *aff'd* 260 Fed.Appx. 905 (6th Cir. 2008).

Newbold's Rule 12(b)(6) argument, as pled in the Newbold Motion, rests solely upon his contention that the claims pled in the Complaint are barred by *res judicata* and judicial estoppel – two affirmative defenses. And, ordinarily, "plaintiffs have no duty to plead facts negating an affirmative defense" in their complaints, though they can "plead[] [themselves] out of court by alleging facts that are sufficient to establish the defense." *Arandell Corp. v. Am. Elec. Power Co., Inc.*, No. 2:09-cv-231, 2010 WL 3667004, at *4 (S.D. Ohio Sept. 15, 2010) (quoting *Hollander v. Brown*, 457 F.3d 688, 691 (7th Cir. 2006)); *see also Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 86 Fed.Appx 137 (6th Cir. 2004) ("A complaint need not anticipate every defense and accordingly need not plead every response to a potential defense."); *US v. Carell*, No. 3:09-CV-445, 2010 WL 599190, at *3 (M.D. Tenn. Feb. 17, 2010) ("[A] 12(b)(6) motion is generally not an appropriate vehicle for raising an affirmative defense.").

So, as relevant here, when evaluating the Newbold Motion, the Court can consider the allegations on the face of the Complaint, the exhibits attached to the Complaint, and relevant documents and pleadings from the Kimpel's Jewelry bankruptcy case – *i.e.*, the schedules and statement of financial affairs, the KJ Plan and attendant disclosure statement, etc. – because those documents are matters of public record in its bankruptcy case. However, even after carefully considering the information contained in all of those documents, the Court cannot determine when

the claims asserted in the Complaint accrued. And because the Kimpels had no duty to plead facts negating Newbold's *res judicata* defense in the Complaint, the Court is not able to decide whether the claims asserted in the Complaint are barred by *res judicata* in the context of the Newbold Motion. Accordingly, that portion of the Newbold Motion should be denied.

Similarly, Newbold contends in his post-Newbold Hearing pleading that the doctrine of judicial estoppel precludes Kimpel's Jewelry from asserting the claims pled in the Complaint. In short, according to Newbold, because these claims and/or causes of action were not scheduled under § 521(a)(1)(B)(i) of the Bankruptcy Code, "[t]he doctrine of judicial estoppel 'prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" Craig Newbold's Supplemental Mot. to Dismiss Compl. or, in the Alternative for Abstention at ¶ 5 (citing *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)).

Like the Fifth Circuit, the Sixth Circuit has held that judicial estoppel may apply to litigation claims that are undisclosed in bankruptcy. *White v. Wyndham Vacation Ownership, Inc.,* 617 F.3d 472, 476 (6th Cir. 2010); *Reed v. City of Arlington*, 620 F.3d 477, 482 (5th Cir. 2010). For judicial estoppel to apply, three factors are considered: (i) the party's later position must be clearly inconsistent with its earlier position, (ii) the party must have succeeded in persuading the court to accept its earlier position, and (iii) the party to be estopped must have acted intentionally and not inadvertently. *White*, 617 F.3d at 478; *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999). A debtor who fails to disclose a claim has acted intentionally and not inadvertently when the debtor knew of the facts giving rise to its inconsistent position and had a motive to conceal the claims. *White*, 617 F.3d at 476-77; *In re Coastal Plains*, 179 F.3d at 212. By contrast, a debtor's failure to disclose a cause of action might be deemed inadvertent in circumstances where: "(1) the debtor lacks

knowledge of the factual basis of the undisclosed claims, and (2) where the debtor has no motive for concealment." *White*, 617 F.3d at 476.

Once again, the timing of the accrual of the Kimpel's Jewelry claims against the defendants is crucial to the application of the doctrine of judicial estoppel. If the claims accrued after confirmation of the KJ Plan, there was nothing to disclose in the Kimpel's Jewelry bankruptcy case and judicial estoppel would not apply to bar the prosecution of those claims against the defendants. However, if the claims accrued prior to confirmation of the KJ Plan, they were property of the Kimpel's Jewelry bankruptcy estate and the failure to disclose them would bar their assertion here unless the failure to disclose was inadvertent. From the face of the Complaint and other appropriately considered documents it is impossible to determine (i) when the Kimpel's Jewelry claims accrued, and (ii) if they accrued prior to confirmation of the KJ Plan, whether the failure to disclose them was inadvertent. And because the Kimpels had no duty to plead facts negating Newbold's judicial estoppel defense in the Complaint, the Court is not able to decide whether the claims asserted in the Complaint are barred by judicial estoppel in the context of the Newbold Motion. Accordingly, that portion of the Newbold Motion should be denied.

Moreover, even assuming the Kimpel's Jewelry claims against the defendants accrued after confirmation of the KJ Plan, Kimpel's Jewelry's failure to disclose the existence of the so-called First Newbold Contract on its Schedule G could also create an additional judicial estoppel problem. The First Newbold Contract was allegedly entered into on October 12, 2005 (three days prior to the Kimpel's Jewelry bankruptcy filing). When Kimpel's Jewelry failed to disclose the existence of this contract in its bankruptcy schedules, it essentially took the position that no such contract existed. And by confirming the KJ Plan the Ohio bankruptcy court accepted Kimpel's Jewelry's position that

no such contract existed. Of course, Kimpel's Jewelry is now suing to recover damages for an alleged breach of that contract, which is inconsistent with its earlier position that the contract did not exist. So, the first two factors for the application of judicial estoppel appear to be satisfied here with respect to Kimpel's Jewelry's claims for an alleged breach of the First Newbold Contract. What cannot be determined on the face of the Complaint (and other appropriately considered documents) is whether Kimpel's Jewelry's failure to disclose the existence of the First Newbold Contract on Schedule G was intentional or inadvertent. And because the Kimpels had no duty to plead facts negating Newbold's judicial estoppel defense in the Complaint, the Court is not able to decide whether the claims asserted in the Complaint are barred by judicial estoppel in the context of the Newbold Motion. Accordingly, that portion of the Newbold Motion should be denied.

### 2.    Claims asserted by Kimpel.

For the reasons explained more fully below, the Court also concludes that Kimpel may (i) not own the claims he attempts to assert here, or (ii) be judicially estopped from asserting those claims. Although no defendant raised issues surrounding Kimpel's ownership of the claims and thus his standing to bring them, the Court may address this issue *sua sponte*. *See Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 498 (5th Cir. 2004) (courts may raise standing *sua sponte* even though it was not raised by the parties); *Wieburg v. GTE Sw. Inc.*, 272 F.3d 302, 306 (5th Cir. 2001) (holding that claims that were the property of a chapter 7 estate and therefore should have been disclosed in the plaintiff's bankruptcy schedules belonged to the Trustee, who was "the real party in interest with exclusive standing to assert them"); *Cargo v. Kansas City S. Ry. Co.*, 408 B.R. 631, 638 (W.D. La. 2009) (holding trustee of debtors' chapter 7 estates was only party with standing to pursue undisclosed prepetition causes of action that belonged to debtors as of

commencement of their bankruptcy cases).

### a. Who owns these claims?

Kimpel's potential standing problem – *i.e.*, his lack of ownership of the claims – may arise from his failure to disclose in his personal bankruptcy case (i) the claims he asserts in the Complaint, and (ii) his ownership of 100% of the stock of Providential and Kimpel's Jewelry. As noted previously, Kimpel filed for relief under chapter 7 of the Bankruptcy Code on October 15, 2005. Kimpel, like every debtor, was required file a schedule of his assets and liabilities. 11 U.S.C. § 521(a)(1)(B)(i). Specifically, he was required to disclose any potential claims or causes of action he held on the petition date on his Schedule B, as those claims or causes of action were property of his bankruptcy estate under § 541(a)(1) of the Bankruptcy Code. *See Walton v. Wheatly Co.*, No. 92-3379, 1993 WL 43934, at *1 (6th Cir., Feb. 19, 1993) ("the bankruptcy estate comprises all legal or equitable interests of the debtor in property as of the commencement of the case … includ[ing] causes of action."). Moreover, Kimpel was required to disclose the extent of his stock holdings in Providential and Kimpel's Jewelry on the petition date on his Schedule B, as that stock was also property of his bankruptcy estate under § 541 of the Bankruptcy Code. Finally, Kimpel, like every debtor, was under a continuing duty to update his schedules to disclose any claims, causes of action, or other assets that he became aware of while his bankruptcy case remained open. *In re Tennyson*, 313 B.R. 402, 405-6 (Bankr. W.D. Ky. 2004) ("The duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy court.").

The Court has reviewed Kimpel's Schedule B, as it may do in connection with the Newbold Motion. *Nieman*, 108 F.3d at 1554. Kimpel marked "[n]one" where potential causes of action must be disclosed. And he never amended Schedule B to disclose any of the claims or causes of action

asserted in the Complaint. If those claims or causes of action accrued prior to October 15, 2005, Kimpel was required to disclose them as they were property of his bankruptcy estate. And, because he failed to disclose them, "the trustee could not evaluate the claims to determine if [they] should be pursued by the estate." *In re Robbins*, 398 B.R. 442, 445 (Bankr. W.D. Ky. 2008) (Because counterclaims were known to defendant-chapter-7-debtors at the time of filing but were not listed on the bankruptcy schedules they remained property of the bankruptcy estate and the chapter 7 trustee was the party with proper standing to pursue them).

Moreover, Kimpel failed to disclose his stock ownership in either Providential or Kimpel's Jewelry, as he marked "[n]one" in response to item 12 of Schedule B, which asked him to identify "[s]tock and interests in incorporated and unincorporated businesses." And, from the allegations in the Complaint, it is apparent that Kimpel owned 100% of the stock of Providential and Kimpel's Jewelry on the date that he filed his chapter 7 case. Kimpel's trustee should have had the opportunity to consider what to do with these stock holdings – *i.e.*, liquidate them for the benefit of Kimpel's creditors or abandon them if they were of inconsequential value to the bankruptcy estate.

When property of the estate is not scheduled by a debtor as required by § 521(a)(1)(B)(i) of the Bankruptcy Code, it is not abandoned under § 554(c), which provides that "any property scheduled under section 521(1) [sic] of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title." Moreover, in accordance with § 554(d) of the Bankruptcy Code, "property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate."

Accordingly, to the extent that Kimpel's claims and/or causes of action against the defendants, including Newbold and MI, accrued prior to October 15, 2005, they are property of Kimpel's

bankruptcy estate and the chapter 7 trustee, not Kimpel, is the party who owns those claims and has the right to decide whether to bring them. *In re Tennyson*, 313 B.R. at 406; *see also Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) ("In a [c]hapter 7 case, at the close of the bankruptcy case, property of the estate that is not abandoned under § 554 and that is not administered in the bankruptcy proceedings – including property that was never scheduled – remains the property of the estate.") (internal quotation marks omitted). Because this Court cannot determine from the face of the Complaint which claims Kimpel is pursuing individually and when those claims accrued, the Court is not able to decide whether the claims asserted in the Complaint are owned by Kimpel or by the chapter 7 trustee appointed in his bankruptcy case. Accordingly, it is not yet appropriate to dismiss any such claims.

However, because Kimpel's ownership of 100% of the stock of Providential was never disclosed, the Court concludes that the chapter 7 trustee appointed in Kimpel's chapter 7 case owns the stock of Providential and is entitled to control Providential and any claims it may own against the defendants. Accordingly, the claims asserted by Providential against the defendants in the Complaint should be dismissed without prejudice to the rights of the chapter 7 trustee to refile such claims if appropriate. While this same conclusion may apply with respect to the claims asserted by Kimpel's Jewelry against the defendants, the analysis is more complicated given confirmation of the KJ Plan. Accordingly, that issue is left for further development and is not properly disposed of at this time.

**b.      Does judicial estoppel bar the claims?**

Judicial estoppel may apply such that Kimpel cannot assert the claims pled in the Complaint. As noted previously, the doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another

phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted). If the claims pled by Kimpel in the Complaint accrued after his personal bankruptcy filing, there was nothing to disclose and judicial estoppel would not apply to bar their prosecution here. And because the Kimpels had no duty to plead facts negating Newbold's judicial estoppel defense in the Complaint, the Court is not able to determine when the claims accrued and thus, is not able to decide whether the claims asserted in the Complaint are barred by judicial estoppel in the context of the Newbold Motion. Accordingly, that portion of the Newbold Motion should be denied.

However, even assuming that the claims accrued post-petition, Kimpel's failure to disclose the existence of the so-called First Newbold Contract on his Schedule G may create judicial estoppel problems for him here. The First Newbold Contract was allegedly entered into on October 12, 2005 (three days prior to Kimpel's bankruptcy filing). When Kimpel failed to disclose the existence of this contract in his bankruptcy schedules – *i.e.*, Schedule G, he essentially took the position that no such contract existed. And, by granting his discharge in bankruptcy, the Ohio bankruptcy court accepted Kimpel's position that no such contract existed. Of course, Kimpel is now suing to recover damages for an alleged breach of that contract. This action by Kimpel is inconsistent with his earlier position that there was no such contract. So, the first two factors for the application of judicial estoppel appear to be satisfied here with respect to Kimpel's claim for an alleged breach of the First Newbold Contract. What cannot be determined at the motion to dismiss stage is whether Kimpel's failure to disclose the existence of the First Newbold Contract on Schedule G was intentional or inadvertent. And because the Kimpels had no duty to plead facts negating Newbold's judicial estoppel defense in the Complaint, the Court is not able to decide whether the claims asserted in the Complaint are barred by judicial estoppel in the context of the Newbold Motion. Accordingly, that portion of the Newbold

Motion should be denied.

Similarly, Kimpel's failure to disclose his one-hundred percent (100%) ownership of Providential[15] in his schedules may create judicial estoppel problems for him here.  When Kimpel failed to disclose his ownership of Providential in his bankruptcy schedules, he essentially took the position that he did not own Providential.  And, by obtaining his discharge in bankruptcy, the Ohio bankruptcy court accepted Kimpel's position that he did not own Providential.  Of course, Kimpel, as the controlling officer of Providential, has now decided that Providential should pursue its claims against the defendants, which could inure to his personal benefit as its sole shareholder depending upon the outcome of the litigation and the capital structure of Providential.  These acts appear inconsistent with his earlier position that he did not own Providential.  So, the first two factors for the application of judicial estoppel may be satisfied here with respect to the assertion of claims by Providential that may insure to the benefit of Kimpel as the purported sole shareholder of Providential, when that stock remains property of Kimpel's bankruptcy estate.  In other words, Kimpel cannot personally profit from Providential's claims against the defendants.  Any value that might otherwise accrue to his equity interests in Providential belongs to his chapter 7 trustee given his failure to disclose his stock holdings in Providential in his chapter 7 case.  What cannot be determined at the motion to dismiss stage is whether Kimpel's failure to disclose his ownership of Providential was intentional or inadvertent.  And because the Kimpels had no duty to plead facts negating Newbold's judicial estoppel defense in the Complaint, the Court is not able to decide whether judicial estoppel applies to prevent Kimpel's pursuit of claims on behalf of an entity that he

---

[15]  The same analysis would apply to Kimpel's failure to disclose his ownership of Kimpel's Jewelry. However, that analysis is more complicated due to confirmation of the KJ Plan.  Because the Kimpels had no duty to plead facts negating Newbold's judicial estoppel defense in the Complaint, the Court will not discuss Kimpel's failure to disclose his ownership of Kimpel's Jewelry further here.

failed to disclose his ownership of in his chapter 7 bankruptcy case. Accordingly, that portion of the Newbold Motion should be denied.

However, since the stock in Providential remains property of the estate due to Kimpel's failure to disclose it on his schedules, Kimpel's chapter 7 trustee is entitled to (i) be told that he owns 100% of the stock of Providential, and (ii) decide who should control the operations of Providential, including pursuit of the claims against the defendants. Accordingly, those claims cannot be pursued here and should be dismissed without prejudice to the refiling of same once authorized to do so by the chapter 7 trustee and/or the Ohio bankruptcy court.

## IV.    CONCLUSION

Because of the breadth of its "related to" jurisdiction, the Court concludes that it has "related to" jurisdiction over the claims the Kimpels have asserted in the Complaint against the non-debtor defendants. However, the Court also concludes that it should abstain from hearing the claims against the non-debtor defendants in accordance with 28 U.S.C. § 1334(c)(1).

Alternatively, if its decision to abstain is erroneous and is reversed on appeal by final order, the Court would grant the MI Motion unless an amended complaint was filed consistent with this Memorandum Opinion within fourteen (14) days after the entry of that final order. However, the Court would not grant the Newbold Motion based upon Newbold's contention that the claims asserted in the Complaint are barred by *res judicata* and judicial estoppel. The Kimpels had no duty to plead facts in the Complaint negating these affirmative defenses. And, under the facts present here, it is not appropriate to decide these defenses on the basis of a Rule 12(b)(6) motion.

However, because Kimpel's ownership of 100% of the stock of Providential was never disclosed in Kimpel's chapter 7 bankruptcy case, the Court concludes that the chapter 7 trustee

appointed in that case owns the stock of Providential and is entitled to control Providential and any claims it may own against the defendants. Accordingly, if the Court's decision to abstain is reversed by final order, the claims asserted by Providential against the defendants in the Complaint will be dismissed without prejudice to the refiling of same once authorized to do so by the chapter 7 trustee and/or the Ohio bankruptcy court. While this same conclusion may apply with respect to the claims asserted by Kimpel's Jewelry against the defendants, the analysis is more complicated given confirmation of the KJ Plan. Accordingly, that issue is left for further factual development and is not properly disposed of in the context of the Newbold Motion.

An order abstaining from hearing the claims asserted against the non-debtor defendants will be entered separately.

### ### End of Memorandum Opinion ###